UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| AMERICAN MODERN SELECT INSURANCE COMPANY, | ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | |
| v. | ) ) | No.: 3:11-CV-129 (VARLAN/SHIRLEY) |
| RODNEY S. HUMPHREY and LISA P. HUMPHREY, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| JESSICA ZAJAC McCOY, | ) ) | |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM OPINION

This matter is before the Court on the Motion for Summary Judgment [Doc. 9], submitted by defendant/counter-plaintiff Jessica Zajac McCoy ("McCoy"), and the Motion for Summary Judgment [Doc. 13], submitted by plaintiff/counter-defendant American Modern Select Insurance Company ("American Modern"). McCoy has responded in opposition [Doc. 15] to American Modern's motion for summary judgment. American Modern has submitted a consolidated brief in support of its motion for summary judgment and response in opposition to McCoy's motion for summary judgment [Doc. 14]. The parties have submitted no other responsive briefs to the pending motions and the time for doing so has passed. *See* E.D. TN. LR 7.1(a), 7.2. The motions are ripe for determination.

For the reasons set forth herein, McCoy's motion for summary judgment [Doc. 9] will be **DENIED** and American Modern's motion for summary judgment [Doc. 13] will be **GRANTED** because the Court finds that there was a single "occurrence" in this case. Accordingly, the amount of liability coverage American Modern is required to pay McCoy on behalf of the policyholders, Rodney S. Humphrey and Lisa P. Humphrey (the "Humphreys"), is limited to **$10,000.00**.

I.  **Relevant Facts and Procedural History**

The facts of this case are undisputed for purposes of summary judgment.

On or about May 22, 2008, the Humphreys, owners of a home on Bacon Road in Jefferson County, Tennessee, purchased a homeowner's policy issued by American Modern (the "Policy"). The Policy contains the following provision:

COVERAGE E - PERSONAL LIABILITY

> If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:
>
> 1. Pay up to our limit of liability for the damages for which an insured is legally liable. Damages include prejudgment interest awarded against an insured.
>
> However, we will pay no more than $10,000 for any claim made or suit brought against an insured for bodily injury or property damage caused by any animal owned by, or in the care, custody or control of, any insured. This limit is the maximum we will pay for any one occurrence.

[Doc. 10-1, p. 19]. The term "occurrence" is defined in the Policy as:

2

> [A]n accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results, during the policy period, in:
>
> a. Bodily injury[.]

[*Id.*, p. 3].

On May 22, 2008, McCoy was jogging along Bacon Road when she was attacked by seven dogs owned by the Humphreys. The dogs were allowed to roam free without restraint. The attack lasted approximately twenty minutes during which all seven of the dogs bit McCoy. As a result of the attack, McCoy sustained 147 wounds on her arms, legs, head, torso, and buttocks. Three hundred staples were required to close her wounds. Throughout the duration of the attack, the dogs dragged McCoy 15 to 20 yards along Bacon Road. McCoy was ultimately able to stop the attack when she made it to a nearby house, knocked the dogs off with a lawn ornament, and wedged her body between the storm door and the main door of the house. Following the attack, McCoy was taken to the hospital where she remained for five days to receive treatment for her injuries. As a result of the attack and her wounds, McCoy has dozens of scars on her arms and legs. McCoy also has an injury to the perineal nerve of her right leg which causes her to have a permanent foot drop. McCoy's medical bills total $49,867.72.

McCoy filed a lawsuit in the Circuit Court of Jefferson County (the "state court action") alleging that the Humphreys were the owners of the dogs, that they allowed the dogs to roam at large, and that their negligence caused her injuries [Doc. 1, ¶ 7]. On or about September 15, 2010, a judgment [*see* Doc. 10-5] was entered in the state court action

awarding McCoy $100,000.00 against the Humphreys. By a compromise settlement agreement, the parties agree that the judgment in the state court action is effective only to the extent of any insurance coverage available to the Humphreys [*Id.*; Doc. 1, ¶ 10].

American Modern filed a complaint for a declaratory judgment in this Court to determine the amount of liability coverage it is required to pay McCoy under the Policy [Doc. 1, ¶ 10]. In the complaint, American Modern asserts that the provision in the Policy limiting liability coverage to $10,000.00 per occurrence is valid and enforceable and applicable to this case in that the dog attack on McCoy constitutes a single occurrence [*Id.*, ¶ 11]. McCoy filed an answer and a counter-complaint asserting that the provision in the Policy limiting liability coverage to $10,000.00 requires payment of up to $10,000.00 for each of McCoy's 147 wounds as separate, multiple occurrences [Doc. 4, ¶ 4]. Alternatively, McCoy asserts that the provision provides up to $10,000.00 in liability coverage for each of the seven dogs involved in the attack [*Id.*, ¶ 5]. The parties filed cross motions for summary judgment requesting that the Court apply their respective interpretations of the provision in the Policy limiting liability coverage to $10,000.00 per occurrence [Docs. 9, 13].

## II.  Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339

4

(6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the non-moving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Catrett*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

Here, both McCoy and American Modern have filed motions for summary judgment pursuant to Rule 56 seeking the Court's ruling on the amount of liability coverage afforded under the Policy under the circumstances of this case.

## III.  Analysis

These cross motions for summary judgment present two issues, the first determinative of the second. The first issue is whether, under the Policy and given the undisputed facts, the attack on McCoy by seven dogs resulting in 147 wounds constitutes a single occurrence or multiple occurrences. The second issue is what is the amount of liability coverage American Modern is required to pay McCoy under the Policy on behalf of the Humphreys. That is, whether coverage is limited to $10,000.00 for a single occurrence, whether American Modern is required to pay up to $10,000.00 for each of McCoy's 147 wounds because each would constitutes a separate occurrence, or whether American Modern is required to pay McCoy up to $10,000.00 for each of the seven dogs involved in the attack.

Because this case is before the Court pursuant to diversity jurisdiction, the Court will apply Tennessee law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000). Under Tennessee law, a court should construe an insurance policy in the same manner as it would construe any other contract. *Am. Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn. 2000). The policy language should be taken and understood in its plain, ordinary, and popular sense. *Id.* When a court must resolve a dispute concerning contract interpretation, it should ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language

6

in the contract. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn.1999). If possible, all provisions in the contract should be construed in harmony with each other to promote consistency and to avoid repugnancy between the various provisions. *Id.* Language in an insurance policy is ambiguous if there are multiple reasonable interpretations, and ambiguous language that would limit the coverage of the policy must be construed against the insurance company and in favor of the insured. *Hutchison*, 15 S.W.2d at 815.

In Tennessee, exceptions, exclusions, and limitations in insurance policies must be construed against the insurance company and in favor of the insured. *Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. 1991). The entire policy at issue, however, including insuring clauses and exceptions thereto, must be read as a whole. *Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp.*, 793 F.2d 780, 782 (6th Cir. 1986). In addition, exceptions should not be construed so narrowly as to defeat their evident purpose. *Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc.*, 972 S.W.2d 1, 8 (Tenn. Ct. App. 1998).

Guided by these general rules of interpretation, the Court will now discuss the Policy, the term "occurrence," and the resulting amount of liability coverage American Modern must pay to McCoy because of the dog attack.

### A. The "Effects" Theory

The parties agree that Tennessee follows the "effects" theory. This theory states, generally, that limits in a liability policy which limit the insurer's liability to a specified amount "per occurrence" or "per accident" refers to the effect of the occurrence or accident, thus making the entire policy limits available to each injured or damaged party. *See* Michael

7

P. Sullivan, *What constitutes single accident or occurrence within the liability policy limiting insurer's liability to a specified amount per accident or occurrence*, 64 A.L.R.4th 668, § 3. As noted in *Brooks v. Memphis & Shelby Cnty. Hosp. Auth.*, 717 S.W.2d 292, 297 (Tenn. Ct. App. June 10, 1986), Tennessee's classification as a jurisdiction which follows the effects theory resulted from the Tennessee Supreme Court's opinion in *Kuhn's of Brownsville v. Bituminous Cas. Co.*, 270 S.W.2d 358 (1954). Both parties analyze *Kuhn's* and *Brooks* in support of their respective interpretations of whether the dog attack in this case presents a single occurrence or multiple occurrences. Accordingly, the Court finds a review of *Kuhn's* and *Brooks* to be helpful.

In *Kuhn's*, the defendant issued the plaintiff an insurance policy on two buildings. *Id.*, 270 S.W.2d at 358. The plaintiff undertook a remodeling of the two buildings to make one building out of the two. *Id.* The remodeling included excavation work under the two buildings, including removing the wall between the buildings. *Id.* The plaintiff's excavation work was complete when a building along the east side of the insured premises collapsed. *Id.* at 359. Two days later, the building immediately to the west of the insured premises also collapsed. *Id.* It was determined that the plaintiff's excavation work was the proximate cause of both collapses, but no excavation work had been completed between the dates of the two collapses. *Id.* Each of the collapsed buildings was under different ownership and both owners filed claims against the plaintiff for damages on account of the collapses. *Id.* While admitting that the plaintiff was obliged to pay the owners of each of the damaged properties,

8

the defendant argued that there had been only one accident, with separate items of damage resulting from that accident. *Id.*

The trial court found that there were two separate unforeseen "accidents" due to the same excavation and that the defendant was liable for twice the amount it would have had to pay had there been only one accident. *Id.* at 358, 360. In affirming the trial court and finding that the plaintiff was entitled to recover for two separate accidents resulting from the excavation, the Tennessee Supreme Court stated as follows:

> The second question presents that matter of the amount of this liability. If the losses complained of by the complainant were for one accident, the liability would be $10,000, but if there were two separate accidents, then complainants would be entitled to recover twice the amount. The second collapse did not happen until two days after the first, and we think it clear that there were two accidents involved herein. If the excavation was a single act, and constitutes a single accident, then the question comes as to when the accident occurred. The owners on the west suffered no loss and experienced no unforeseen event until the 29th.

*Id.* at 360.

The facts in *Brooks* differ from the facts in *Kuhn's*. In *Brooks*, the plaintiffs' decedent, an elderly man, was admitted to the defendant hospital for treatment for presumed pneumonia. *Id.*, 717 S.W.2d at 293. Upon his admission to the hospital, it was discovered that the decedent had heart disease. *Id.* A pacemaker was implanted and the decedent was discharged. *Id.* A few weeks later, after complaining of chest and stomach pains, the decedent was admitted to the hospital for a second time. *Id.* While the decedent was at the hospital, an x-ray technician employed by the hospital took the decedent on a stretcher to

9

undergo an x-ray. *Id.* After the x-ray, the technician negligently failed to properly secure the decedent on the stretcher and left him unattended. *Id.* While the technician was gone, the decedent rolled off the stretcher and onto the floor, causing him to suffer a fractured hip which required major corrective surgery. *Id.* After the surgery, the decedent's physician ordered a nurse employed by the hospital to administer 50 milligrams of a drug to the decedent for his heart disease. *Id.* at 294. In carrying out this order, the nurse negligently administrated the equivalent of 1000 milligrams of the drug to the decedent. *Id.* The decedent died from the overdose. *Id.*

The defendant hospital was a county hospital, therefore the plaintiffs brought suit under the Governmental Tort Liability Act (the "GTLA"), which limits damages to $20,000 "for bodily injury or death of any one (1) person in any one (1) accident." *Id.* at 295 (quoting Tenn. Code Ann. § 29-20-403(b)(1)). The trial court found that the decedent's injury and death were direct and proximate results of negligence on the part of both the technician and the nurse. *Id.* at 294-95. The negligence of the technician was the direct and proximate cause of the decedent's fractured hip and the negligence of the nurse was the direct and proximate cause of the decedent's death. *Id.* The injury and death, however, were not related except that the decedent suffered both. *Id.* Given a limitation on damages in the GTLA to $20,000 for bodily injury or death of any one person per accident, the trial court found that the plaintiffs were limited to collecting $20,000 in damages. *Id.* at 295.

In dissecting the provision of the GTLA limiting damages to $20,000, the Tennessee Court of Appeals noted that the GTLA "provides that a claimant may recover up to $20,000 for either bodily injury or death as to a singular person 'in any one accident.'" *Id.* at 295-96. The court of appeals observed that the GTLA contains no definition of "accident" and found that "what we are called upon to do is to decide what constitutes 'one' accident as through we were dealing with a liability policy limiting the insurer's liability to the specified amount of $20,000." *Id.* at 296. The court of appeals quoted from the following annotation:

> There is a conflict of authority which originates in what may be called a difference in the philosophical approach to the problem of causation. The majority of the courts take the viewpoint that the "per accident" clause is to be construed from the point of view of the cause of the accident rather than its effect. In some instances, however, the courts have adopted the viewpoint that the "per accident" clause is to be construed as referring to the result or effect of the accident on the persons injured or damages and not as referring to the cause of the accident.

*Id.* at 296 (quoting C.T. Drechsler, *What constitutes "each," "a single," "one," "any one," or "an" accident or occurrence, within liability policy limiting insurer's liability to specified amount*, 55 A.L.R.2d, 1300, 1302-03 (superseded by 64 A.L.R.4th 668)).

The court of appeals then compared the facts in *Brooks* to those in *Kuhn's*, concluding that the different circumstances of the two cases supported rather than detracted "from the concept that there were two separate unforseen events or accidents. *Id.* at 297. The court of appeals noted that under *Kuhn's*, Tennessee is in the category of "construing 'one accident' from the point of view of the persons injured rather than from the point of view of the

11

proximate cause of the accident." *Id.* at 297 (discussing *Kuhn*). The court of appeals then explained that in *Kuhn's*:

> [T]here was a single act of negligence that caused separate damage to two separate property owners. In [*Brooks*], there were two separate and distinct acts of negligence by two different individuals that occurred on two different dates . . . and the acts of negligence were perpetrated on a single person rather than on two persons.

*Id.* at 297. Thus, the court of appeals held, the facts in *Brooks* presented two separate and distinct accidents which produced two separate and distinct causes of action, and, therefore, the maximum coverage available was $40,000 rather than the $20,000 found by the trial court. *Id.*

Given these explanations of the effects theory by Tennessee courts and the application of that theory to two different sets of facts, the Court disagrees with McCoy's argument that under the Policy, there were seven occurrences because seven dogs were involved in the attack. Interpreting the term "occurrence" in this manner would be inconsistent with the effects theory followed by Tennessee courts. As acknowledged by McCoy [Doc. 11, p. 13], interpreting the term "occurrence" as the number of dogs would be a utilization of the "cause" theory, which is not followed in Tennessee, in that the per occurrence provision of the Policy would be construed from the point of view of one of the causes of the dog attack—the seven dogs— rather than its effect. Given the discussions in *Kuhn's* and *Brooks* of the interpretation of "per occurrence" and "per accident" provisions under the effects theory in policies limiting coverage liability, the Court does not find that the provision of the

12

Policy which limits coverage to $10,000.000 to reasonably be interpreted as providing that each dog was a separate occurrence resulting in bodily injury.

### B. *Koikos* and the Cause Theory

McCoy's argument that the dog attack should be analyzed in accordance with the Florida Supreme Court's decision in *Koikos v. Travelers Ins. Co.*, 849 So.2d 263 (Fla. 2003), is also not well-taken. As discussed in *Koikos*, Florida follows the "cause" theory which "looks to the cause of the injuries, rather than the 'effect theory,' which looks to the number of injured plaintiffs." *Id.* at 265, 269.[1] In *Koikos*, the insured policy holder was Koikos, the owner of a restaurant where a shooting occurred which resulted in multiple injuries to several different victims. *Id.* at 264-65. Two men had entered Koikos' restaurant and one of the man brandished a gun from which he fired two separate, but nearly concurrent rounds. *Id.* at 265. Two victims were each hit by a single bullet from the first round of shots. *Id.* The two victims filed separate lawsuits against Koikos claiming negligent failure to provide security at his restaurant. *Id.* Koikos brought a declaratory action against Travelers, his

---

[1]The Florida Supreme Court's explanation of the effects theory also does not support McCoy's argument because in *Koikos*, the court noted that the effects theory is based on a "a per person/per accident policy." *Id.*, 849 So.2d at 269. McCoy has provided no case law stating otherwise, or holding that the effects theory bases the appropriate inquiry on the number of injuries or wounds suffered by a victim.

While a cursory analysis of *Brooks* could led to the conclusion that the holding of that case was based on the number of harms suffered by the decedent—his fractured hip from the fall off the stretcher and his death from the drug overdose—a more thorough reading of *Brooks* shows that the holding is focused on the finding that there were "*two* separate and distinct accidents" resulting from "*two* separate and distinct acts of negligence by *two* different individuals that occurred on *two* different dates[.]" *Brooks*, 717 S.W.2d at 297, 298.

13

insurance company, and the parties asked the district court to decide whether the underlying shooting incident constituted a single occurrence, subject to the $500,000 limit in Koikos's insurance policy, or comprised two separate occurrences, for which Travelers would be liable for $500,000 per occurrence. *Id.* The district court found the underlying shooting incident to constitute one occurrence because "Koikos's liability arose out of his alleged negligence in failing to provide adequate security for the victims[.]" *Id.*

The issue before the Florida Supreme Court was thus "whether the incidents that gave rise to the litigation constitute one occurrence, or multiple occurrences as that term is defined in the policy[.]" *Id.* at 266. The Florida Supreme Court analyzed the term "occurrence" and whether, under the facts of the case and Koikos''s liability coverage, the "occurrences" were the shootings of the two victims or whether the "occurrence" was Koikos's allegedly negligent failure to provide security. *Id.* at 265-66, 269. The Florida Supreme Court concluded that, "consistent with the 'cause theory' . . . when the insured is being sued for negligent failure to provide security, 'occurrence' is defined by the immediate injury-producing act and not by the underlying tortious omission." *Id.* at 271. The Florida Supreme Court concluded that the immediate cause of the victim's injuries were the intervening intentional acts of the shooters and thus, there were two occurrences because each shooting of a separate victim constituted a separate occurrence. *Id.* at 271-72.

There are three important points distinguishing *Koikos* from this case. First, as indicated in *Brooks* and *Kuhn's*, Tennessee follows the effects theory while Florida follows the cause theory. Second, *Koikos* involved an incident with two victims who each suffered

14

a separate injury. Here, there is only one victim who suffered 147 injuries. Third, McCoy has argued that the "per occurrence" provision in the Policy pertains to the negligence of the Humphreys or their failure to secure their dogs, as the victims in *Koikos* argued. Given the foregoing, particularly the Florida Supreme Court's focus on the cause of the incident at issue rather than its effect, the Court does not find *Koikos* helpful to an analysis of the Policy provision in this case.

### C. The "Occurrence"

First, the Court notes that Tennessee courts look not to the cause of an incident when construing a "per occurrence" or "per accident" provision, but to the result or effect of the attack on the victim or victims. Second, neither party has presented the Court with a case containing similar facts as this case.[2] The issue for the Court is thus whether there were 147 occurrences because McCoy suffered 147 wounds, or whether the twenty minute attack constitutes a single occurrence from which McCoy suffered 147 wounds. The Court concludes that the latter is the proper application of this provision.

In *Kuhn's*, there was a single act of negligence which occurred on a single day by a single party and which resulted in damage, on two different days, to two different property

---

[2]In *Crum v. Johnson*, 809 So. 2d 663 (Miss. 2002), cited by McCoy, two people were injured by multiple dogs. The victims of the attacks argued that each person injured by each dog constituted a separate occurrence. *Id.*, 809 So. 2d at 667 (contending that "each effect, or each person injured by each dog, constitutes a separate occurrence under the policy"). The victims did not, therefore, argue that each separate bite, or each dog, constituted a separate occurrence. *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204 (5th Cir. 1971), also cited by McCoy, considered claims of damage due to contaminated bird seed. Similar to *Crum*, *Maurice Pincoffs* also involved multiple injured parties. *Id.*

15

owners. In *Brooks*, there were two separate acts of negligence which occurred on two different days by two different individuals and which resulted in an injury and a death, separated by several days, and suffered by a single victim. In this case, there was a single twenty-minute long attack by seven dogs on a single victim which resulted in 147 wounds to that one victim.

After thorough consideration, the Court finds that the principles and rationales laid out in both *Kuhn's* and *Brooks* leads to the conclusion that in looking at the effect of the dog attack—that McCoy was severely injured—the Policy's per "occurrence" provision does not focus on the number of wounds inflicted on McCoy, but rather, the fact that she was injured. This conclusion is supported by the premise underlying the holding in *Brooks*. That is, that the negligence that caused the decedent's hip fracture was separate and distinct from the negligence that caused his death and thus, the injuries were separate and unrelated, despite being inflicted upon one individual. Similarly, the damages suffered by the two property owners in *Kuhn* were also separate and distinct, although the cause of the damage flowed from one source. In this case, there is no separate and distinct injury or negligence. McCoy's 147 wounds, while on different parts of her body and inflicted by seven different dogs, are not separate and distinct injuries of the type in *Kuhn*, nor are her injuries similar to the separate and distinct injuries suffered by the decedent in *Brooks*. Given this, the Court does not find the language of the Policy, which defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" to be ambiguous or reasonably susceptible to the interpretation urged by McCoy,

16

that an occurrence should be defined by the number of injuries suffered by a victim [Doc. 1-2, p. 3].

The referenced annotation in *Brooks* also supports this conclusion:

> If cause and result are simultaneous or so closely linked in time and space as to be considered by the average person as one event, the courts have invariably found that a single accident within the meaning of the accident clause of the policy has occurred, while if enough time has elapsed between the injuries or damages to the various items involved or if the latter are widely separated in space, the courts have been inclined to allow separate claims even though they sprang from the same cause. Generally speaking, it may therefore be stated that the aggregate of events resulting from insured's negligent act, such as several collisions, constitutes one accident, provided there is a close connection in time and place and a single sequence of cause and effect embracing the entire aggregate of events. If, on the other hand, the times or places and detailed causes of each instance of injury or damages are different they are separate accidents although each contains a common causal factor.

*Id.*, 717 S.W.2d at 297-98 (quoting C.T. Drechsler, *What constitutes "each," "a single," "one," "any one," or "an" accident or occurrence, within liability policy limiting insurer's liability to specified amount*, 55 A.L.R.2d, 1300, 1304 (superseded by 64 A.L.R.4th 668)). Applying this annotation to the circumstances of this case supports the conclusion that the dog attack on McCoy constitutes one occurrence. The amount of time elapsing between the various bites inflicted on McCoy, assuming those time intervals are even ascertainable, would be closely linked in time and space. Further, the twenty-minute dog attack that ranged from 15 to 20 yards down a street constitutes a sufficiently close connection of cause—the attack—and effect—McCoy's wounds—for the attack to be considered one occurrence.

17

In sum, while language in an insurance policy that is susceptible to more than one reasonable interpretation is ambiguous and will be construed against the insurer, under the relevant Tennessee law and Tennessee courts' application of the effects theory to different factual scenarios, the Court does not find the "occurrence" provision of the Policy to be susceptible to more than one reasonable interpretation. The Court finds that the one reasonable interpretation of the "occurrence" provision of the Policy, applied to this case, is that the dog attack on McCoy constitutes a single occurrence. Given this conclusion, the Court finds that the amount of liability coverage American Modern is required to pay McCoy on behalf of the Humphreys is limited to $10,000.00.

## IV. Conclusion

For the reasons given above, McCoy's motion for summary judgment [Doc. 9] will be **DENIED** and American Modern's motion for summary judgment will be **GRANTED**. The Court finds that there was a single "occurrence" and therefore the amount of liability coverage American Modern is required to pay McCoy on behalf of the Humphreys is limited to **$10,000.00**. This case will be **CLOSED** and an appropriate order will be entered.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE